In the Matter of INTERCO
INCORPORATED, et
al., Debtors.

In re INTERCO INCORPORATED.

Harold Wittes, Claimant.

Bankruptcy No. 91–40442–172.

United States Bankruptcy Court,
E.D. Missouri,
Eastern Division.

July 22, 1997.

Bryan, Cave, McPheeters & McRoberts, Gregory D. Willard, Lloyd A. Palans, John C. Boyle, Carl J. Spector, Vicki L. Little, St. Louis, MO, for Debtors–In–Possession.

Michael Flanagan, Polsinelli, White, Vardeman & Shalton, Kansas City, MO, Joel A. Poole, Polsinelli, White, Vardeman & Shalton, Chesterfield, MO, Andrew L. Eisenberg, Nancy Yale Stout, Palmer & Dodge, Boston, MA, for Claimant.

## ORDER

JAMES J. BARTA, Bankruptcy Judge.

This Order addresses the Debtors' objection to the proof of claim filed by Harold Wittes ("Claimant").

This is a core proceeding pursuant to Section 157(b)(2)(B) of Title 28 of the United States Code. The Court has jurisdiction over the parties and this matter pursuant to 28 U.S.C. §§ 151, 157 and 1334, and Rule 9.01 (formerly Rule 29) of the Local Rules of the

United States District Court for the Eastern District of Missouri.

## I. *Background*

On January 24, 1991, Interco Incorporated ("Interco") and thirty affiliated entities ("Debtors") filed for relief under Chapter 11 of the United States Bankruptcy Code. The Debtors' Chapter 11 cases are jointly administered for procedural purposes, pursuant a January 25, 1991 Order of this Court.

The Debtors have continued in possession of their property and have operated and managed their businesses as debtors-in-possession and as Reorganized Debtors. The Debtors' Amended Joint Plan of Reorganization was confirmed by this Court on June 26, 1992.

The thirty-one underlying Bankruptcy cases were closed by the Court on March 19, 1996. In its closing Order, the Court specifically retained jurisdiction to enter a final determination and order with respect to pending matters such as that being concluded here. 28 U.S.C. § 1334; 11 U.S.C. § 1142; Rules 3020(d) and 3021, F.R.B.P.

On June 27, 1991, the Claimant filed Proof of Claim No. 4035 in the Interco case. The claim is based on a nonbankruptcy lawsuit that had been filed against Interco and College–Town, a division of Interco, in 1988. The nonbankruptcy lawsuit was filed in the United States District Court for the District of Massachusetts (Civil Action No. 88–0994–Y) and has been stayed as a result of these bankruptcy proceedings. The Claimant filed a motion to modify the automatic stay of 11 U.S.C. § 362 so as to permit him to proceed with the litigation commenced in Massachusetts. This Court denied the motion on December 6, 1991.

In the underlying lawsuit, the Claimant filed a two-count First Amended Complaint alleging that the Defendants had violated the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* ("ADEA"). Claimant also alleged that the Defendants had violated the age discrimination provisions of the Massachusetts General Laws c. 151B. Mass. Gen. L. ch. 151B, § 4 (1990).

On November 4, 1991, Interco filed an objection to Mr. Wittes' claim. On December 9, 1991, Mr. Wittes filed a "Motion for Mandatory Withdrawal of All Proceedings Related to Proof of Claim Filed by Harold Wittes Pursuant to 28 U.S.C. § 157(d)" in the United States District Court for the Eastern District of Missouri. Simultaneously, Mr. Wittes filed with this Court a "Motion for Stay or, in the Alternative, for Continuance of Hearing," in which he requested this Court to stay the hearing of Debtors' objection to his claim pending a decision by the District Court on the withdrawal of the reference motion. This Court denied the motion to stay on January 21, 1992; the District Court denied the motion for withdrawal of the reference on March 3, 1992.

On March 24, 1992, the Claimant filed a motion in which he requested this Court to "transfer this proceeding to the United States Bankruptcy Court for the District of Massachusetts, or in the alternative, to appoint a special master located in the District of Massachusetts to make proposed findings of fact." On April 13, 1992, this Court denied Claimant's motion.

The trial of this matter included the testimony of witnesses for both parties. Numerous exhibits were submitted and have been reviewed by the Court. As part of certain post-trial proceedings, the Parties stipulated to the admissibility of the deposition of Carl Packer, an Executive Vice President of an Interco operating division.

Based on the evidence presented and the record as a whole, including the post trial stipulations, memoranda and letter briefs, this Court makes the following findings of fact and conclusions of law.

## II. *Discussion—Prima Facia Case*

Interco is a Delaware corporation. Until it ceased operations, College–Town was an operating division of Interco that manufactured and distributed women's clothing. *Deposition of Carl Packer,* March 1, 1989, p. 17. In 1966, the Claimant was hired by College–Town as Distribution Manager of its warehouse facility in Braintree, Massachusetts.

The Claimant testified that prior to joining College–Town, he worked at Majestic Specialties, a women's clothing firm in Cleveland, Ohio. He began his employment there in 1947, working as a stockboy. He testified that he worked his way up, learning different functions including: puffing away stock, picking, packing and writing invoices. By the time he left Majestic Specialties, he was the Distribution Manager. He testified further that as Distribution Manager he was responsible for a "three-floor operation" which was a "hands-on operation." He asserted that he was involved in putting together a computer package so the company could ship more goods in a shorter period of time.

In 1966, the Claimant was hired by College–Town. At that time, the College–Town management included: George Sibley—the founder of College–Town and Chairman of the Board; Gerald Sibley—the President of College–Town; Arthur Sibley—the Vice-President of College–Town; and Bill Packer, who was the uncle of Arthur and Gerald Sibley.

The Claimant began work as the Distribution Manager at the College-town facility in Braintree, Massachusetts. The Braintree facility was the only facility operated by College–Town at that time. The Braintree facility had approximately 100,000 square feet of space: 60% was distribution space and 40% was space for cutting, or for piece-goods and office space. The Claimant explained that cuffing involved laying a pattern on top of fabric and cutting it. The cut pieces were then sent to vendors who would assemble the garments and send them back to Braintree as finished product.

The Claimant provided the Court with a detailed description of the operations which were involved in warehousing clothing and defined some terms which are used in the clothing industry. He explained that most clothing firms receive garments on hangars. The hanging garments must be unloaded from specially devised trucks quickly and the garments must come off the truck in a specific way. The "flat garments" must also be unloaded and put directly into stock. The "receiver" must count everything that comes off the truck. Then the receiver breaks down all the clothes by style, size and color, and records that information on receiving records. The company selects a certain percentage of the garments to be inspected after they are received as a quality check.

After the inspection, the goods are moved to a stock area. The garments are usually hand-pushed on a "slick rail", a special tubing that supports moving trolleys. Once the stock reaches the designated location, the garments are "coordinated". Tops and bottoms with the same coloration and the same styling are put together. The coordinated items are put in a specific area.

"Allocation" is the process by which available finished goods are assigned to fill open customer orders. The allocator's job is to coordinate shipments. Inventory may be allocated on a "first come, first served" basis. However, the allocator must also deal with a preferred list of customers who are usually served first. After the allocator determines which styles are available and coordinates colors, the order goes to the "picker."

The "order picker" is the person who fills an order which is also known as order "picking". The picker goes to the specific area of the aisle, selects clothing by style, size and color and puts it onto a trolley. The order is then pushed into the checking area where the garments are checked against the order for style, size and color and the checker records the number of garments which were selected. Next, the order is pushed into the packing area where the order "packer" checks the total number of garments which were selected and checked against the number the checker wrote on the document. After the order is packed, it goes to the "shipper" who makes out the bills of lading, attaches the shipping label and prepares the order for loading. Finally, the "handlers" load the orders onto the proper trucks.

The Claimant testified that when he first came to Braintree, "everything was old-fashioned." Orders were selected from handwritten documents and it took a long time to complete the order process. The machinery was antiquated and the process depended on hole-punch cards. He stated that he implemented a computerized system and took

courses from IBM in order to assist with the change.

The Claimant was responsible for an expansion of the Braintree facility in about 1970. The distribution center was enlarged by about 55,000 square feet, and the cutting center was expanded to included piece goods, inspection and storage areas.

He testified that as Distribution Manager, he filled in for workers who were missing from any of the departments. Thus, while he was in a managerial position, he continued to perform the "hands-on" functions such as checking, packing and picking.

The Claimant's duties included staffing the distribution facility. He explained that when College-Town was smaller, he was responsible for hiring people because there was no personnel director. In 1969 or 1970, the Claimant hired Burt Spigel, who was then in his last year of high school. *Testimony of Harold Wittes*, March 14, 1992. Mr. Spigel began working after school as a stock-boy. Mr. Spigel worked at College–Town while he went to college. According to the Claimant, Mr. Spigel "performed excellent" at "every task, regardless of where I put him, he did a good job." The Claimant testified that he trained Mr. Spigel to perform the various functions, including picking, packing and checking. *Id.; see also Testimony of Burt Spigel*, March 14, 1992. Mr. Spigel testified that he worked with the Claimant, that the Claimant knew how to do the various functions, including the allocation function, and that the Claimant actually performed those functions. After Mr. Spigel completed college, in 1974, the Claimant hired him full-time as an order picker. Later, Mr. Spigel served as assistant to the Allocation Manager in the Braintree facility. *Testimony of Burt Spigel*, March 14, 1992.

The Claimant testified that in the 1970's, College–Town developed the Pant-her line as an upgraded "missy" line. The Pant-her line originally occupied one corner of the Braintree facility, but it rapidly outgrew the space. The Claimant and the Sibleys (the founders of College–Town) decided to move Pant-her to another building which would house Pant-her cutting, hanging and distribution of flat goods. In about 1977, the new 165,000

square foot warehouse was built in Randolph, Massachusetts. At that time, the Braintree facility encompassed approximately 200,000 square feet.

The Claimant was instrumental in designing the new warehouse at Randolph. He testified that he was involved with every facet of the design in order to accommodate all the functions and to anticipate growth within the Randolph facility. He testified further that Gerald and Arthur Sibley complimented his work and displayed a great deal of confidence in him. The Sibley brothers asked the Claimant to present to Interco the plans for the new warehouse in Randolph along with the budget for every phase of the operation. The Claimant explained that he examined all the competitive bids, scheduled the arrival of the goods so they would not arrive before the building was completed, and staffed the building with the correct number of employees.

In about 1978, the Claimant moved Mr. Spigel to the Pant-her building in Randolph. Toward the end of that year, he promoted Mr. Spigel to Distribution Manager of the Randolph facility. *Testimony of Harold Wittes*, March 14, 1992. The Claimant assumed the title of "Corporate Director of Distribution." Mr. Spigel continued as the Distribution Manager of the Pant-her building until the warehouse was closed in 1986. *Testimony of Burt Spigel*, March 14, 1992.

The Claimant testified that Mr. Spigel had no responsibility for the operation at Braintree. He explained that Mr. Spigel reported to him. Once a day, usually during his lunch hour, the Claimant went to the Randolph facility to check "what Burt was doing." *Testimony of Harold Wittes; Testimony of Burt Spigel*, March 14, 1992. Mr. Spigel also met with the Claimant every one or two weeks at Braintree. *Testimony of Harold Wittes; Testimony of Burt Spigel.* Mr. Spigel testified that during his visits to Braintree, he observed the Claimant "instructing new employees how to do certain functions [and] pitching in when needed in various areas." *Testimony of Burt Spigel*, March 14, 1992.

In 1981 and 1982, the Claimant continued to perform his duties as Distribution Manager for the Braintree facility. He testified that he continued to fill in to perform the hands-on functions if he was needed.

The Claimant testified that he was proficient with the computer system which had been updated in about 1975. He testified that as part of this update, the allocation function was computerized. The Claimant and Mr. Spigel helped a computer programmer develop an allocation software package. The Claimant explained that this was a simple system under which the program would generate questions in response to which the distribution staff person merely had to enter data. He testified that the allocation system was never totally computerized; color and style were still selected from hard copies. He stated further that he could use the computer at the Randolph facility, but he worked primarily with the computer at the Braintree facility. Mr. Spigel worked with the computer at the Randolph facility. The Claimant testified that he used the computer when he filled in for the Allocation Manager.

The Claimant testified that by 1982, Panther was growing much more rapidly than anticipated. Therefore, the cutting and piece-goods facilities were moved to the Braintree facility. In addition, a line of clothing for large ladies was moved to Braintree. He testified that in order to accommodate the additions to Braintree, he redesigned the Braintree building, which included an addition of 140,000 square feet. He explained that he had to make the Braintree distribution center into a two-floor operation. In order to move the hanging goods to the second floor, he introduced power units which were used in addition to the slick rail system. The power units moved the trolleys up a 30–40 degree incline. He stated that during the expansion and transition phase, he continued to perform hands-on functions when necessary.

The Claimant testified that the responsibilities he assumed during the expansions in 1977 and 1982 were extraordinary duties and were not really the duties he performed on a daily basis. He explained that he spent 95% of his time at the Braintree facility working on the floor of the warehouse and only spent about 5% of his time in his office. He asserted that he continued to perform the hands-on functions associated with the distribution facility during his tenure as Corporate Director of Distribution.

By 1978 or 1979, the Claimant's superior was Carl Packer. Mr. Packer was the Executive Vice President of College–Town until 1985. In 1985, Mr. Packer left College–Town for about four months, and then returned in November of 1985 as President of College–Town.

The testimony indicated that Mr. Packer exercised very little daily supervision over the Claimant. The Claimant testified that he submitted various warehouse staffing reports to Carl Packer. If additional people were required, or if additional money was needed to buy equipment, he went to Mr. Packer. He testified that Mr. Packer never had any complaints about his work.

The Claimant testified that from 1978 through 1984, he was evaluated annually by Mr. Packer. During those reviews, according to the Claimant, Mr. Packer usually did not inquire as to how the operation of the distribution area could be improved. Mr. Packer acknowledged that he had found the Claimant's job performance "[g]enerally good." *Deposition of Carl Packer*, March 1, 1989, pp. 57–58.

The Claimant testified he was responsible for implementing wage increases for the employees in the warehouse operations. He explained that he was a given a budget for each building. Generally he would be given funds to distribute a 4% or 5% across the board wage increase. Each employee would be entitled to a raise based on a percentage of his salary. He testified that he had the authority to give himself an increase of 5%, when other employees were given similar increases. However, in 1984, he took no pay increase so that the amounts available for his supervisors' increases would be more substantial. He explained that he worked for the company and did not think of himself first.

According to Carl Packer, in late 1983, College–Town began to scale down and com-

bine certain operations within the company because sales were declining. *Deposition of Carl Packer*, March 1, 1989, pp. 35–36. He asserted that certain functions were consolidated, and in 1984 or 1985 the cutting department at Braintree was closed. *Id.* at 36–37.

In late 1985 or early 1986, a decision was made to consolidate the distribution warehousing operations. *Id.* at 38; *Testimony of Harold Wittes.* The Claimant testified that the Production Manager/Vice President of Production asked him to help plan a consolidation of the two warehouses. He explained that he worked with Burt Spigel to eliminate the Randolph operation. Together, they decided which employees would be in charge of each area after the consolidation. He testified that at some point he realized the plan would result in the termination of employees at both facilities, "because we went by seniority." *Testimony of Harold Wittes*, March 14, 1992. He anticipated that after the consolidation, he would be both "Director of Distribution" and "Distribution Manager", and that Mr. Spigel would manage the second floor of the distribution facility at Braintree. The Claimant testified that he created a written report outlining his plan for the consolidation of the two warehouses. In the spring of 1986, he submitted the written consolidation plan to Carl Packer.

Mr. Packer did not work with the Claimant in developing the report. *Testimony of Harold Wittes*, March 14, 1992. The Claimant asserted that Mr. Packer knew nothing about the operations which would be affected by the report. He explained that Mr. Packer spent very little time in the warehouse. From late 1985 until his discharge, the Claimant testified that he recalled seeing Mr. Packer in the Braintree warehouse only once or twice.

In his deposition, Mr. Packer asserted that he did not remember that the Claimant had developed a formal written consolidation plan. However, he stated that Mr. Wittes had "worked out" the consolidation. *Deposition of Carl Packer*, March 1, 1989, pp. 44–47.

## A. The Termination

In the middle of April, 1986, Mr. Packer called the Claimant on the public address system. The Claimant called Mr. Packer on the phone, and Mr. Packer said, "Harold, I want to see you in my office right away. Where've you been?" The Claimant explained that he had been over to the Panther building and then had been in the back.

The Claimant reported to Mr. Packer's office, and Mr. Packer told him that he was being "let go." In response to the Claimant's question as to why he was being let go, Mr. Packer replied, "You don't fit in." The Claimant said that he did not understand, and again asked for an explanation. Mr. Packer again said, "Harold, you don't fit in." The Claimant testified that Mr. Packer offered him $25,000 in severance pay. He responded that it was not a matter of money and that he wanted his job. He offered to take a cut in pay, but Mr. Packer repeated, "No. You just don't fit in." The meeting continued for another ten to fifteen minutes without a resolution, and they agreed to meet the next Monday morning.

The following Monday, the Claimant went to Mr. Packer's office. Mr. Packer was on the phone, and motioned for him to go away. Later that morning, Mr. Packer summoned him to his office over the public address system. When they finally met, the Claimant asked again why he was being discharged. Mr. Packer continued to assert that he did not fit in. The Claimant explained all the functions he had performed for the Company. Mr. Packer then said, "Harold, physically you can't do the job." The Claimant testified that he told Mr. Packer that he had helped unload and check thousands of garments from Greece during the summer of 1985 which certainly involved physical effort. Mr. Packer "started to back off and said ... 'O.K. maybe physically you could handle it, but this is a hands-on job.'" *Testimony of Harold Wittes*, March 14, 1992. The Claimant explained that he had always performed hands-on functions, but that Mr. Packer kept asserting that he didn't fit in.

At Mr. Packer's request, they met again later that day. The Claimant testified that he offered to take a cut in pay. Mr. Packer

again said, "No, you just don't fit in, Harold." Mr. Packer offered $37,500 in severance pay, and offered to pay his medical expenses.

The Claimant testified that during these termination meetings, Mr. Packer told him that he couldn't perform the picking and packing functions anymore, and that he was more of an administrator. The Claimant asserted that he was a hands-on person, and that he spent 95% of his day "on the floor." *Testimony of Harold Wittes.*

In his deposition, Mr. Packer was asked why the Claimant was terminated. Mr. Packer explained he "didn't feel at the time that [the Claimant] was best suited for the job function that remained ... a hands-on distribution manager ..." *Deposition of Carl Packer,* p. 45. Mr. Packer asserted that the Claimant had performed "more of a planning and executive kind of a role, getting things done through others." *Id.* He expected that after the consolidation, the manager of the warehouse would be "on the floor working, on the computer working." *Id.* at 46. Mr. Packer stated that prior to the consolidation, neither the Claimant nor Mr. Spigel were performing the duties that he expected the distribution manager to perform after the consolidation. *Id.* He asserted that he selected Mr. Spigel for the position because Mr. Spigel had performed the "specific skills" such as allocating, picking and receiving "more recently [than the Claimant had.]" *Id.* at 47. Mr. Packer denied that he had questioned the Claimant's physical ability to do the job. *Id.* at 54. However, Mr. Packer stated in various ways that he did not believe that the Claimant had the skills to perform the hands-on functions and that he "didn't think he was well suited psychologically to do some of the other things that needed to be done ... [l]ike picking, like packing like receiving." *Id.* at 55. Mr. Packer asserted that he did not believe that the Claimant could run the computer. *Id.* at 55, 73 and 77. In addition, Mr. Packer asserted that the Claimant was "pretty far removed from menial functions." *Id.* at 74. According to Mr. Packer, the Claimant "may have done [these hands-on functions] once upon a time" but Mr. Spigel performed these functions "much more recently than did Mr. Wittes." *Id.* at 75. He contended that Mr. Spigel knew how to perform the various functions better because he performed them more frequently. *Id.* at 76–77. Mr. Packer argued that Mr. Spigel could perform the hands-on functions better because he "was closer in terms of his own personal work experience to the jobs that needed to be done ... [c]loser in time frame from when he did those things to what he was doing now." *Id.* 84–85. Mr. Packer asserted that he was "not specifically aware ... when Mr. Wittes ever picked or packed ... [b]ut if he did, it was a long time ago." He asserted that the Claimant would be more inclined to try to delegate those functions or avoid them. *Id.* at 89.

## B. Post-Termination

Although Mr. Packer offered to let the Claimant leave immediately, the Claimant chose to stay at College–Town for the next two weeks, during which time he trained Mr. Spigel. The Claimant explained that Mr. Packer did not tell him that Mr. Spigel would be replacing him, but he assumed Mr. Spigel would be taking over. Mr. Spigel testified that after he learned of the Claimant's termination, Mr. Spigel asked Mr. Packer, "Who is taking Harold's position?" Mr. Packer replied, "You are, didn't you know."

The Claimant taught Mr. Spigel how to handle the purchasing of all the equipment and supplies for the Braintree distribution facility. He also familiarized Mr. Spigel with all the reports and showed him every phase of the operation. He testified that Mr. Spigel had not seen the power unit, so he showed him that part of the operation. The Claimant introduced Mr. Spigel to each of the supervisors and explained each of their functions and how they interacted.

At the time of the Claimant's termination, Mr. Spigel was 33 years old, and the Claimant was 58 years old. Mr. Spigel testified that he took the Claimant's position; he sat in the Claimant's chair; he worked in the Claimant's office, and performed the functions the Claimant had performed. Mr. Spigel asserted that after he assumed the position, he was "responsible for the entire warehouse operation, the staffing, the planning, budgetary process, salary and wage

reviews, ordering of supplies, monitoring claims, chargebacks, working with the supervisors making sure that things were properly allocated, making sure that we met completion dates, working with production, etcetera." Mr. Spigel averred that these were the same functions he had observed the Claimant performing.

Mr. Spigel testified that the Claimant performed the functions competently and performed them as well as Mr. Spigel did. Mr. Spigel also testified that the Claimant had more experience than he did.

Mr. Spigel testified that he assumed a new title with his new job: Corporate Director of Distribution—the same title that the Claimant had held prior to his termination. As part of his Exhibits, the Claimant submitted College–Town "Vacation Forms" for Burt Spigel for the years 1986 and 1987. These forms listed the following information: "Dept. Name: Distribution—Director Corp. Dist." and "Dept. No.: 140–1." *Claimant's Exhibits* 11 and 12; *Testimony of Burt Spigel.* The Claimant also submitted a document entitled "Transfer Form" which reflected the transfer of Burt Spigel from "Dept. 240–02" to "Distribution Mgr." in Department "140–01." *Claimant's Exhibit* 8. During his employment as Corporate Director of Distribution, the Claimant had been assigned the "Dept." number of "140–01." *Claimant's Exhibit* 10. Mr. Spigel continued to work at College–Town for approximately two years after accepting this position.

Prior to the Claimant's departure, Mr. Packer issued a written announcement which stated that the Claimant was resigning. The Claimant refused to sign the announcement, because he was not resigning. The Claimant testified that during his last two weeks at College-Town, he learned that Burt Spigel was replacing him.

The Claimant testified that he harbored no bad feelings toward Mr. Spigel. Rather, in addition to preparing Mr. Spigel to replace him, he had left a note for Mr. Spigel in his desk wishing him good luck. *Testimony of Harold Wittes; Testimony of Burt Spigel.*

On cross-examination, the Debtors elicited testimony from Claimant that he had filed a Charge of Discrimination with the Massachusetts Commission Against Discrimination ("MCAD"). The Claimant admitted that in the documents he filled in connection with the filing of that charge, he made no reference to Mr. Packer's comments as to his physical ability to do the job. *See also Debtors' Exhibits* S and V. The Claimant explained that the question was never raised; he was never asked about that area and was not given an opportunity to say anything. He did not understand that he was to provide a complete description of each and every conversation he had with Mr. Packer. He stated that "[d]espite specific requests by [him] on several occasions for an explanation of [his] discharge, [he had] never received one." *Debtors' Exhibit* V, p. 2. After he left College–Town, the Claimant was employed at Summit Sportswear from June of 1986 to July of 1987. He testified that he was discharged from Summit Sportswear because that company had overstated its need for new employees, and the Claimant was the first one terminated because he was the last one hired. He explained his termination had nothing to do with his performance.

The Debtors asserted that after the closing of the Pant-her building, there was no need for coordination of activities between two facilities and no need for consulting and planning with managers at two facilities. However, Mr. Spigel testified that there was need for ongoing coordination between the two buildings for several more months until the Pant-her building was actually closed in June of 1986. In addition, the testimony indicated that there were two different operations at the Braintree facility after the consolidation: College–Town and Pant-her.

### C. Age-related Comments and Testimony

The Claimant testified that during 1985, Mr. Packer came into the Claimants office and asked him where his secretary was. He answered that his secretary had had a minor heart attack, and was recuperating. He testified that Mr. Packer asked, "How old is she?" He told him that his secretary was about 66 years old. Mr. Packer replied, "Get rid of her, she's too old." The Claimant

testified that the secretary had worked for him for 10 or 12 years, during which time he had no complaints about her. He testified further that after this exchange with Mr. Packer, he did nothing to discharge his secretary. He testified that Mr. Packer "let [him] know" he was wrong for not following Mr. Packer's directive.

Mr. Spigel also testified about the termination of supervisory personnel. He observed that "many of them were middle-aged or older", and defined middle aged as age 48 or older. The Claimant identified six employees who were discharged when they were in their late 50's or early 60's.[1]

### III. *Age Discrimination*

The proceedings in this case have arisen out of Debtors' objection to the claims filed in compliance with 11 U.S.C. § 501 by Harold Wittes in these bankruptcy estates. Section 502 of Title 11 of the United States Code provides:

> A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest ... objects.

11 U.S.C. § 502(a).

"A properly filed proof of claim is a prima facie evidence of the amount and validity of the claim, and a debtor who objects must offer evidence in rebuttal." *In re Paige*, 106 B.R. 346, 349 (Bankr.D.Conn. 1989); *see also In re Kahn*, 114 B.R. 40, 44 (Bankr.S.D.N.Y.1990). "If the objecting party rebuts the claimant's prima facie case, 'it is for the claimant to prove his claim, not for the objector to disprove it.'" *In re Kahn*, 114 B.R. at 44 (quoting *In re Gorgeous Blouse Co., Inc.*, 106 F.Supp. 465 (S.D.N.Y. 1952)).

This Court finds that in the preliminary proceedings in connection with these objections to claims, the Debtors have rebutted the evidence derived from and based on the Claimant's properly filed proof of claim. The claims are as yet unliquidated, and the Debtors have denied liability. Thus, as this Court announced prior to trial, the burden shifted to the Claimant to establish his right to payment pursuant to the proof of claim. Accordingly, Claimant presented his case as a plaintiff would in an age discrimination action, and Debtors responded as defendants. In the pleadings filed in connection with these claims and this claim objection, the Claimant alleged that Debtors violated the Age Discrimination in Employment Act and the age discrimination provisions of the Massachusetts laws set forth as Mass.Gen.L. Ch. 151B, § 4.[2] Massachusetts courts have generally applied the same analysis to state and federal discrimination claims. Therefore, this Court will analyze these claims collectively. *White v. Univ. of Massachusetts at Boston*, 410 Mass. 553, 574 N.E.2d 356, 358 (1991); *see also Wheelock v. Massachusetts Comm'n Against Discrimination*, 371 Mass. 130, 355 N.E.2d 309, 313 (1976) (The Massachusetts Supreme Judicial Court analyzes 151B claims pursuant to the burdens set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)).

The Age Discrimination in Employment Act ("ADEA") provides, in pertinent part:

> It shall be unlawful for an employer—
> (1) ... to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age ...

29 U.S.C. § 623(a)(1).

### A. Order of Proof

"The United States Supreme Court set forth guidelines to analyze discrimination

---

**1.** The Claimant also testified about a sales meeting which he, Burt Spigel and department heads attended. He explained that sales had been declining. He testified that Arthur Sibley stated, "If you old-timers can't do the job, I have young turks and they're gonna take over." Mr. Sibley was not one of the decision makers at the time of the Claimant's termination.

**2.** The Massachusetts statute provides, in pertinent part:

It shall be an unlawful practice ... 1B. For an employer in the private sector, by himself or his agent, because of the age of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual, or to discriminate against such individual in compensation or in terms, conditions or privileges of employment, unless based upon a bona fide occupational qualification.
Mass. Gen. Laws Ann. Ch. 151B, § 4 (West 1992).

claims [under the Civil Rights Act of 1964] in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *Johnson v. Minnesota Historical Society*, 931 F.2d 1239, 1242 (8th Cir.1991). It is well settled that those guidelines are applicable to age discrimination cases brought under the ADEA. *Hall v. American Bakeries Co.*, 873 F.2d 1133, 1134 (8th Cir.1989) (citations omitted).

According to the *McDonnell Douglas* guidelines, "the burden of production rests first with the plaintiff to establish a prima facie case of discrimination." *Hall v. American Bakeries*, 873 F.2d at 1134. If the plaintiff establishes a prima facie case, "the burden shifts to the defendant to show some legitimate, nondiscriminatory reason for the adverse employment action." *Id.* At this point, the burden is only one of production; the ultimate burden of persuasion remains with the plaintiff to show that but for his age, he would not have been adversely affected by the employment decision. *Mechnig v. Sears, Roebuck & Co.*, 864 F.2d 1359, 1364 (7th Cir.1988) (citations omitted); *Phipps v. Gary Drilling Co., Inc.*, 722 F.Supp. 615, 619 (E.D.Cal.1989). If the defendant shows a legitimate reason, then the burden shifts back to the plaintiff to show by a preponderance of the evidence "that the defendant's proffered reason was pretextual.". *Hall v. American Bakeries*, 873 F.2d at 1134 (citing *McDonnell Douglas*, 411 U.S. at 802–804, 93 S.Ct. at 1824–25); see also *Mechnig v. Sears*, 864 F.2d at 1364.

### B. Prima Facie Case

■ "The prima facie case serves an important function in the litigation: it eliminates the most common nondiscriminatory reasons for the plaintiff's rejection." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253–54, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981).

■ As the United States Supreme Court noted in *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978), the prima facie case "raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consid-

eration of impermissible factors." *Id.* at 577, 98 S.Ct. at 2949–50.

In *McDonnell Douglas*, the Supreme Court outlined certain elements which a plaintiff might use to prove a prima facie case of discrimination. *McDonnell Douglas Corp.*, 411 U.S. at 802, 93 S.Ct. at 1824. However, the Court added "that this standard is not inflexible, as '[the] facts necessarily will vary in Title VII cases, and the specification ... of the prima facie proof required from [plaintiff] is not necessarily applicable in every respect in differing factual situations.'" *Burdine*, at 254, n. 6, 101 S.Ct. at 1094, n. 6 (quoting *McDonnell Douglas* at 802, n. 13, 93 S.Ct. at 1824, n. 13).

As noted above, the *McDonnell Douglas* guidelines are applicable to age discrimination cases brought under the ADEA. *See Hall v. American Bakeries*, 873 F.2d at 1134. The Eighth Circuit has developed criteria which a plaintiff in an age discrimination action might use to establish a prima facie case. The courts in the Eighth Circuit have varied the criteria applicable to different factual situations. In particular, when the alleged discriminatory action involves a reduction in work force, the courts have added a fifth element, and required that a plaintiff establish that his age was a determining factor in the defendant's actions.

Recently, this Court considered a reduction in work force situation in the age discrimination claims of a separate claimant against these Debtors. *In re Interco*, 152 B.R. 273 (Bankr.E.D.Mo.1993). In the Memorandum associated with its Order, the Court outlined the factors that a claimant must establish to prove a prima facie case of age discrimination in a reduction in work force case. Those factors include:

(1) The plaintiff was in a protected age group, which under the ADEA includes individuals "who are at least 40 years of age." 29 U.S.C. § 631(a);

(2) The plaintiff was performing his job at a level that met the defendant's legitimate expectations;

(3) Despite plaintiff's performance, he was terminated;

(4) Plaintiff's job in its various parts continued in existence.

*Id.* at 284. *See also Johnson,* 931 F.2d at 1242–1243; *Hall,* 873 F.2d at 1134.

■ In addition, if a reduction in work force is a factor, the plaintiff must establish a fifth element by presenting additional evidence that age was "a determining factor" in defendant's actions. *Id.*

In the matter being considered here, the Claimant has argued that the Court should apply the four-element prima facie test used in cases which do not involve reductions in work force. Claimant contends that the reduction in work force factors are not appropriate because Claimant's job was not eliminated, but was taken over by Mr. Spigel after Mr. Wittes' termination. The Debtors have argued that Claimant cannot establish a prima facie case under the four-factor test because Claimant's job did not continue in existence.

■ The evidence adduced at this trial shows that in 1986, the two warehouses were consolidated into one facility. This consolidation entailed some reductions in the total work force. Mr. Wittes was terminated in connection with the consolidation of the warehouses; however, both Mr. Wittes and Mr. Spigel testified that Mr. Spigel assumed Mr. Wittes' duties, his title of Corporate Director of Distribution, his Department Number of 140–01, his office, his desk and his chair. Mr. Spigel also testified that Mr. Packer told him that Mr. Spigel was taking Mr. Wittes' place. This Court finds that, even though evidence was presented that Mr. Wittes' position was not eliminated, Mr. Wittes' termination occurred during and as part of a reduction in work force. Therefore, it is more appropriate that this Court use the analysis applicable in work force reduction cases.

■ First, Claimant established that he was within a protected age group. The ADEA protects individuals "who are at least 40 years of age." 29 U.S.C. Section 631(a); Mr. Wittes was 58 years old at the time of his termination.

Second, Claimant established that he was performing his job at a level that met Col-lege–Town's legitimate expectations. Mr. Wittes testified that he received favorable comments about his work and that prior to the meetings with Mr. Packer, he had not received complaints about his ability to do the job. Debtors did not contend that, prior to his termination, Mr. Wittes was not performing adequately. In his deposition, Mr. Packer stated that Mr. Wittes had generally performed well.

Claimant established the third element of his prima facie case. Mr. Wittes' performance as Corporate Director of Distribution was not inadequate, nor was his performance as Corporate Director of Distribution the reason for his termination. Therefore, Mr. Wittes established that, despite his performance in his job, he was terminated.

Fourth, Mr. Wittes established that his job in its various parts continued in existence. Mr. Wittes' position as Corporate Director of Distribution was not eliminated. In addition, the evidence shows that Mr. Wittes trained Mr. Spigel to perform the duties Mr. Wittes had previously performed. Mr. Wittes taught Mr. Spigel how to handle the purchasing of all the equipment and supplies for the Braintree distribution facility. He also familiarized Mr. Spigel with all the reports and showed him every phase of the operation. Mr. Wittes introduced Mr. Spigel to each of the supervisors and explained each of their functions and how they interacted.

Mr. Spigel testified that he assumed Mr. Wittes' position and he was thereafter responsible for the entire warehouse operation, including staffing, planning, the budgetary process, salary and wage reviews, ordering supplies, monitoring claims, chargebacks, working with the supervisors to ensure that items were properly allocated, ensuring that completion dates were met, and in general, working with the production department. Mr. Spigel testified that these were the same functions he had observed Mr. Wittes performing.

■ In addition to the four factors described above, Mr. Wittes must establish that his age was a determining factor in the defendant's actions. "[T]he fact that the plaintiff's duties were assumed by a younger per-

son [is] in itself insufficient to establish a prima facie case." *Johnson v. Minnesota Historical Soc.,* 931 F.2d 1239, 1243 (8th Cir.1991). "Rather, to establish a prima facie case, the plaintiff must come forward with additional evidence to establish that age was a factor in his termination." *Id.* (citing *Holley v. Sanyo Mfg., Inc.,* 771 F.2d 1161, 1166 (8th Cir.1985)). Additional evidence is necessary, "otherwise every plaintiff in a protected age group would be allowed a trial simply because he was discharged during a reduction in work force." *Id.*[3]

The Eighth Circuit has stated that

[t]his further showing could take many forms. Direct evidence ... simply makes unnecessary the burden-shifting analysis. Such showing could be made, however, by statistical evidence (as, for example, where a pattern of forced early retirement or failure to promote older employees can be shown) or circumstantial evidence (such as a demonstration of a preference for employees in the business organization).

*Holley,* 771 F.2d at 1166 (citing *Stanojev v. Ebasco Services, Inc.,* 643 F.2d 914, 921 (2d Cir.1981)).

 Mr. Wittes testified that during 1985, Mr. Packer made derogatory comments related to the age of Mr. Wittes' 66 year old secretary. Age-related comments, made by the decision maker, may constitute evidence of age discrimination for the purpose of establishing a prima facie case. *See Beshears v. Asbill,* 930 F.2d 1348, 1354 (8th Cir.1991). Even where a decision-maker's comments do not relate directly to a plaintiff's termination, those comments may be found to be relevant evidence of discriminatory attitude. *Id.* (quoting *Gray v. University of Ark.,* 883 F.2d 1394, 1398 (8th Cir.1989)).

Mr. Wittes and Mr. Spigel testified that they had observed that many of the supervisory personnel that were terminated were middle-aged or older; the employees were described as being in their 50's or 60's. Although the Debtors have denied these alle-gations, this testimony when considered in context with the other evidence of age discrimination on the record, is sufficient to support Claimant's prima facie case.

 Another indication of age discrimination appears from the substantial difference between the ages of Mr. Wittes and his replacement. At the time of his termination and replacement by another employee, the Claimant was 58 years old, and his replacement was 33 years old. "Because the ADEA prohibits discrimination on the basis of age and not class membership, the fact that a replacement is substantially younger than the plaintiff is a far more reliable indicator of age discrimination than is the fact that the plaintiff was replaced by someone outside the protected class." *O'Connor v. Consolidated Coin Caterers Corporation,* —— U.S. ——, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996).

Mr. Wittes also presented evidence and testimony concerning a series of conversations he had with Mr. Packer regarding the reasons for Mr. Wittes' termination. Among other things, Mr. Wittes testified that Mr. Packer told him that he could not physically do the job; that Mr. Wittes was not a hands-on person; and that he was more of an administrator. At another point, Mr. Packer asserted that Mr. Wittes was being terminated because he didn't fit in. In addition, in his deposition, Mr. Packer asserted that Mr. Wittes had performed the various "hands-on" functions "a long time ago" and that Mr. Wittes was not "psychologically" suited for the job. Taken together, these various statements and explanations may be construed as demonstrating evasion and inconsistency by the employer. The Eighth Circuit has noted that "evasion and inconsistency" by the employer contribute to a finding of age discrimination. *Brooks v. Woodline Motor Freight, Inc.,* 852 F.2d 1061, 1064 (8th Cir.1988).

The Eighth Circuit has stated further that "the factually-oriented, case-by-case nature of ADEA claims requires that we not be overly rigid in our consideration of the evi-

---

**3.** Other cases have held that "in a reduction-in-force situation the discharged employee will nearly always be qualified for his position, and ... 'anyone in the protected age group will presumptively have a cause of action under the ADEA'...." *Holley v. Sanyo Mfg., Inc.,* 771 F.2d 1161, 1165 (8th Cir.1985) (quoting *Coburn v. Pan American World Airways, Inc.,* 711 F.2d 339, 343 (D.C.Cir.), *cert. denied,* 464 U.S. 994, 104 S.Ct. 488, 78 L.Ed.2d 683 (1983)).

dence of discrimination a plaintiff may offer." *Johnson*, 931 F.2d at 1243. This Court finds that Mr. Wittes presented sufficient evidence to establish a prima facie case of age discrimination.

## IV. *Legitimate Nondiscriminatory Reasons for Discharge and Evidence of Pretext*

### A. Elimination of Claimant's Position

Debtors have proffered nondiscriminatory reasons for discharging Mr. Wittes. According to Debtors, College–Town no longer needed a Corporate Director of Distribution because the two warehouses were consolidated, and operations were scaled down. Debtors argue that as part of this consolidation, Mr. Wittes' position was eliminated.

Debtors have asserted that Mr. Wittes' duties were administrative, and that his primary responsibility was to coordinate the activities of the two warehouses. According to Debtors, after the Randolph facility was closed, there was no need for coordination and Mr. Wittes' services were no longer needed. Debtors also contend that Mr. Spigel did not replace Mr. Wittes. Rather, Mr. Spigel merely became the manager of the Braintree facility and did not assume Mr. Wittes' duties.

### 1. Business Judgment

Debtors also asserted that, in Mr. Packer's business judgment, Mr. Spigel was better suited for the job because he had more recent hands-on experience and was performing the same functions at the Randolph warehouse. In his deposition, Mr. Packer asserted that he did not believe that Mr. Wittes could perform the hands-on functions and that he "didn't think [Mr. Wittes] was psychologically suited to do some of the other things that needed to be done ... [l]ike picking, like packing, like receiving." Mr. Packer also contended that he did not believe Mr. Wittes could run the computer. Mr. Wittes testified that Mr. Packer told him, at one point, that he did not think that Mr. Wittes could physically do the job. Mr. Packer denied making this statement.

### 2. Evidence of Pretext

Under the law of the Eighth Circuit, an employer is not obligated to offer an employee a lower paying or different position in lieu of discharging him, even if he is qualified for that position. However, the employer may not rely on discriminatory reasons for discharging the employee. "Age discrimination is often subtle and 'may simply arise from an unconscious application of stereotyped notions of ability rather than from a deliberate desire to remove older employees from the workforce.'" *Brooks v. Woodline Motor Freight, Inc.*, 852 F.2d 1061, 1064 (8th Cir.1988) (quoting *Syvock v. Milwaukee Boiler Manufacturing Co.*, 665 F.2d 149, 154–55 (7th Cir.1981). Rarely can a plaintiff deliver evidence of a smoking gun.

"A plaintiff cannot argue that the defendant showed bad judgment in deciding another employee had greater potential, but he can argue that the method used by the defendant showed that the defendant was not really trying to decide which employee had greater potential." *Christie v. Foremost Ins. Co.*, 785 F.2d 584, 587 (7th Cir.1986) (quoted in *Hillebrand v. M–Tron Indus., Inc.*, 827 F.2d 363, 367 (8th Cir.1987)). A plaintiff may also demonstrate that an employer's explanation for its action was unworthy of credence. *Mechnig v. Sears, Roebuck & Co.*, 864 F.2d 1359, 1365 (7th Cir.1988). "Proof that an employer's explanation is unworthy of credence may be based on evidence 'showing (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate his discharge, or (3) that they were insufficient to motivate discharge.'" *Id.* (quoting *Kier v. Commercial Union Ins. Cos.*, 808 F.2d 1254, 1259 (7th Cir.1987)). A plaintiff "can establish pretext by introducing evidence to prove that the reason stated by the employer, 'though facially adequate, was untrue as a matter of fact or was, although true, a mere cover or pretext' for illegal discrimination." *Normand v. Research Inst. of America, Inc.*, 927 F.2d 857, 859 (5th Cir.1991) (quoting *Elliott v. Group Medical & Surgical Serv.*, 714 F.2d 556, 566 (5th Cir.1983), *cert. denied*, 467 U.S. 1215, 104 S.Ct. 2658, 81 L.Ed.2d 364 (1984)).

This Court notes that the "credibility of witnesses is often crucial." *Christie*, 785 F.2d at 586. As the trier of fact in this case, it is the burden of this Court to assess the credibility of the witnesses as well as the sufficiency of the evidence. Here, Claimant testified credibly, as did Claimant's witness, Mr. Spigel. It is more difficult to assess the credibility of Mr. Packer, whose testimony was submitted in the form of a written deposition.

■ Mr. Wittes testified that although he assumed the title of "Corporate Director of Distribution" he continued to perform the duties he had performed as the Distribution Manager of the Braintree facility. In addition, Mr. Wittes testified that the administrative and coordinating functions he performed comprised only a small part of his daily duties. He testified that he spent 95% of his time at Braintree on the floor of the warehouse. Further, although he coordinated activities with the facility in Randolph, he spent only an hour or so a day, usually on his lunch hour, meeting with Mr. Spigel at Randolph.

Mr. Wittes also presented evidence which supports his assertion that his position was not eliminated. The evidence shows that after Mr. Wittes' termination, Mr. Spigel assumed the title of "Corporate Director of Distribution" and assumed the same department code number which had been assigned to Mr. Wittes and sat at Mr. Wittes' desk in Mr. Wittes' office. Mr. Spigel testified that he performed the functions which he had previously observed Mr. Wittes performing. During his last two weeks with College–Town, Mr. Wittes trained Mr. Spigel to assume his position.

The Debtors have asserted that Mr. Wittes was dismissed because of a reduction in work force; two warehouses were consolidated into one facility. According to Debtors, Mr. Wittes' position was eliminated, and Mr. Packer reasonably believed that Mr. Wittes was not suited for the position which remained in the consolidated warehouse.

This Court finds that there is substantial evidence that Mr. Wittes' position was not eliminated. As noted above, this evidence includes the fact that Mr. Spigel assumed Mr. Wittes' title, department code number, his office and his responsibilities.

## B. Suitability

Further, this Court finds that Mr. Wittes was not unsuited for the position that Mr. Spigel assumed. Mr. Wittes testified credibly about his familiarity with the hands-on functions performed in the warehouse. He also testified credibly that he had continually performed these hands-on functions. Mr. Wittes testified credibly about his familiarity with and proficiency on the computer. Thus, this Court finds that the reasons proffered by this employer as the basis for its action are unacceptable.

In addition, this Court finds that the method used by the employer to determine which employee was best suited for the job was inadequate. The evidence does not reveal that Mr. Packer observed Mr. Wittes and Mr. Spigel before he came to his conclusions. Nor does the evidence reveal that Mr. Packer made inquiries to others concerning their respective abilities. Rather, this Court finds that the employer's decision was based on assumptions about Mr. Wittes' abilities based on Mr. Wittes' age. In particular, the employer assumed that because Mr. Wittes was older, he had not performed the hands-on functions for a long time. The assumption that Mr. Wittes was not familiar with the computer also demonstrates an impression based on a stereotype of older workers. The employer's contention that Mr. Wittes was not physically or psychologically suited for a vigorous, hands-on position also demonstrates its age-related assumptions.

This Court finds that the evidence presented in this case shows that the reasons proffered by the employer were a pretext for age discrimination.

Therefore, the Court has concluded that the Claimant has established that the Debtor's proffered reasons for its actions were pretextual. Further, the Court has determined that the evidence has established that the basis for the Debtors' decision to terminate the Claimant was discrimination based on age; and that such discrimination is the basis for a judgment under either ADEA or the Massachusetts law at Mass. Gen. L. Ch.

151B, § 4. The Wittes claim will be allowed in these cases.

## V. *Amount of Claim*

The Court has determined that the Claimant was discharged by the Debtors in violation of the Age Discrimination in Employment Act, and therefore is the holder of an unliquidated prepetition claim against the Debtors. Consistent with the Parties' announcements prior to these hearings, and pursuant to the provisions of 11 U.S.C. § 502(c), the Court will estimate the claim for purposes of allowance and payment in this case. The allowed amount of the claim includes several components.

 A successful plaintiff in a non-bankruptcy proceeding under the ADEA is entitled to a judgment for back pay. *See Lorillard v. Pons*, 434 U.S. 575, 584, 98 S.Ct. 866, 872, 55 L.Ed.2d 40 (1978); *Morgan v. Arkansas Gazette*, 897 F.2d 945, 952 (8th Cir.1990). The allowed claim in this matter includes an amount equal to the Claimant's lost income that was a result of the termination of his employment by the Debtors.

At the time of his discharge, the Claimant's annual salary was $67,000.00. In most years, the Claimant had received a salary increase of approximately seven percent. If his pay had been increased by seven percent in each of the two years following his termination, he would have earned $148,398.30. The amount of back wages is subject to a reduction for income that the Claimant may have received from other employment during the period between May 2, 1986 and April, 1988. No deduction is to be made for collateral benefits such as unemployment compensation or welfare payments. *See McDowell v. Avtex Fibers, Inc.*, 740 F.2d 214 (3rd Cir. 1984); *Hegler v. Board of Education of Bearden School District*, 447 F.2d 1078 (8th Cir.1971). The total amount earned from his employment at Summit Sportswear and Robert Scott was $59,000.00. The amount of back pay that will be allowed here is $89,-398.30.

The Claimant here is also entitled to recover the value of lost fringe benefits from the date of his termination in May 1986, until the date College–Town closed in April, 1988. *Kelly v. American Standard, Inc.*, 640 F.2d 974 (9th Cir.1981); *Geller v. Markham*, 635 F.2d 1027, 1036 (2nd Cir.1980). These benefits include Medical Insurance ($1,184.00/year); Healthstyle ($54.00/year); Dental Insurance ($113.00/year); Group Life ($575.00/year); Short Term Disability ($192.00/year); and Long Term Disability ($421.00/year). Based on an annual salary of $67,000.00, the Claimant was also entitled to receive $5,153.00 for four weeks lost vacation time during the two years after his termination. The record has not established that the Claimant is entitled to reimbursement in the amount of about $700.00 for his wife's dental expenses. The total amount of these lost benefits that is to be allowed here is $14,-384.00.

The claim also includes an amount equal to the pension benefits that the Claimant would have received had he not been unlawfully discharged. *Kelly v. American Standard*, 640 F.2d 974 (9th Cir.1981). In the circumstances presented here, the more credible evidence supports the determination that the value of the lost pension benefits is the Claimant's total of $16,885.40 based on the calculations set out in Claimant's Exhibit No. 21.

 A determination of willfulness allows for an award of liquidated damages under ADEA. *Jarvis v. Sauer Sundstrand Company*, 116 F.3d 321 (8th Cir.1997). As noted above, during 1985, one of the Debtors' decision makers made derogatory comments related to the age of the Claimant's 66 year old secretary. The Claimant also testified that other 50 to 60 year old employees were being let go during 1986. The record has established that there is a considerable age difference between the Claimant and the person who replaced him. During the trial of this matter, the Debtors' associate General Counsel testified that at the time of the Claimant's dismissal, College–Town was being sued by a former employee for alleged violations of ADEA. *Trial Proceedings, 4–14–92, Audio Tape No. 4 at Index 192: Claimant's Exhibit No. 22, certified copy of Amended Complaint, U.S.D.C. No. 85–4271–T.* The Debtors' answer to Interrogatory

No. 60, acknowledged, subject to an objection based on attorney/client privilege, that between January, 1983 and February, 1989, the Debtors sought legal advice with respect to age discrimination. Therefore, the Court has determined that the Debtors knew or recklessly disregarded the possibility that their actions toward the Claimant would violate ADEA, and that the Debtors' termination of the Claimant's employment was willful. The allowed amount of this claim includes liquidated damages in the amount of $120,667.70 pursuant to 29 U.S.C. § 626(b).

█ The allowed claim also includes an amount equal to prejudgment interest for the lost economic benefits that resulted from Claimant's discharge by the Debtors. *See Morgan v. Arkansas Gazette*, 897 F.2d 945, 955 (8th Cir.1990); *University of Arkansas Board of Trustees v. Greer*, 466 U.S. 958, 104 S.Ct. 2169, 80 L.Ed.2d 552 (1984). The applicable interest rate in this matter is the average accepted auction price for the last auction of fifty-two week U.S. Treasury Bills. *Doyne v. Union Electric Co.*, 755 F.Supp. 866, 869 (E.D.Mo.1991). The interest rate in May, 1986 was 6.17%. The prejudgment interest is equal to 6.17% of $120,667.70 compounded annually from May, 1986 to the date of this Order for a total of $112,469.20.

█ The record here supports the Claimant's assertion that he is entitled to attorney's fees and costs under 29 U.S.C. § 626(b). The Claimant's Exhibits No. 29 and 30 have described the legal services provided to the Claimant. The amount requested for these services is reasonable. The claim includes the amount of $172,620.33 for legal services through the conclusion of the trial. If additional amounts are to be requested by the Claimant, the Parties are encouraged to attempt to resolve any disputed issues by agreement. If an agreement is not possible, the Claimant may submit an appropriate application and provide notice and an opportunity for a response.

█ Although punitive damages may be awarded under the provisions of ADEA, the circumstances in this case have not presented direct evidence of age animus such that the Court can find that punitive damages will accomplish the purposes of the Massachusetts statute. Mass.Gen.L., Ch. 151B, § 9. The allowed claim does not include an amount representing punitive damages, and the request for punitive damages is denied.

█ The Massachusetts General Laws have been interpreted to allow an award of damages for emotional distress suffered as a result of employment discrimination. *Mass. Gen. Laws Ch. 151B*. In the circumstances presented here, the Court has determined that the Debtors did not act in a particularly unfeeling way when the Claimant was fired. *Franklin Publishing Co., Inc. v. Massachusetts Commission Against Discrimination*, 25 Mass.App.Ct. 974, 519 N.E.2d 798 (1988). Similarly, the record has not shown the presence of any elements in addition to the discrimination violations, such as retaliation by an employer for an employee's pursuit of a claim under Section 151B. *Bournewood Hospital Inc. v. Massachusetts Commission Against Discrimination*, 371 Mass. 303, 315, 358 N.E.2d 235, 242 (1976). The Court has determined that the record here has not established that the Claimant suffered emotional distress as a result of the discrimination, or that the circumstances are such that emotional distress may be inferred from the finding of discrimination alone. *Bournewood* at 317, 358 N.E.2d 235. The claim in this case does not include an award for emotional distress.

**IT IS ORDERED** that this matter is concluded; and that the Debtors' objection to the claim of Harold Wittes, Claimant is **DENIED**; and that said Claimant is the holder of an allowed claim based upon the Debtors' discriminatory actions in firing the Claimant based upon age in violation of 29 U.S.C. § 621, et. seq.

**IT IS FURTHER ORDERED** that pursuant to 11 U.S.C. § 502(c), the Parties' request to estimate the amount of the claim is **GRANTED**; and that Claim No. 4035 is allowed as follows: back pay, $89,398.30; lost benefits, $14,384.00; lost pension benefits, $16,885.40; liquidated damages, $120,667.70; and prejudgment interest, $112,469.20; for a total allowed claim in the amount of $353,-804.60 to be paid pursuant to the terms of

the confirmed plan; and that all other requests in this matter are **DENIED.**